No. 12,609.

THE SOUTHERN WOOD MANUFACTURING AND CREOSOTING COMPANY
vs. WILSON DAVENPORT.

Plaintiff, claiming eviction in part, sues on the obligation of warranty in act of
sale.
*Held:* he is entitled, under the facts disclosed, to be reimbursed only the value of
the part evicted from, estimated proportionately to the price paid for the
whole.

APPEAL from the Civil District Court for the Parish of Orleans.
King, J.

W. S. *Parkerson* for Plaintiff, Appellant.

A. D. *Henriques* for Defendant, Appellee.

Argued and submitted March 24, 1898.
Opinion handed down April 4, 1898.

The opinion of the court was delivered by

BLANCHARD, J. The plaintiff acquired by purchase from Mrs. Susan
A. Sampson five lots of ground in the city of New Orleans, in the
square bounded by Front, Lyon and Bordeaux streets and the Missis-
sippi river.

The lots were designated in the act of sale as Nos. 6, 7, 8, 9 and 10
on a plat or plan made in the year 1848 by C. A. Hedin, surveyor.

They adjoined each other and all fronted on Front street on the
north, and on the Mississippi river on the south.

The three first lots are described as having a width of thirty feet
by a depth of one hundred and fifty feet, *more or less,* to the river,
and the two last as having the same width by a depth of one hundred
and sixty feet, *more or less,* to the river.

It was the same property previously acquired by Mrs. Sampson
from Wilson Davenport, defendant herein, by identically the same
description, for the price and sum of five thousand dollars.

When Mrs. Sampson purchased from Davenport the lots were
vacant. Following her purchase there were erected on the prop-
erty certain improvements, constituting a wood manufacturing

and creosoting plant, with boilers, engines, cylinders, cisterns, tanks, tools, wharves, etc.  These improvements, plant, etc., were included in the sale to plaintiff company, the consideration of which was five hundred shares of the capital stock of the company at the par value of one hundred dollars each.

Just prior to the purchase from Mrs. Sampson, the company had been incorporated, the capital stock being fixed at one hundred thousand dollars, divided into one thousand shares of one hundred dollars each.

It was recited in the act of incorporation that five hundred shares (full paid stock) was to be delivered " to Thomas H. Sampson, owner, for his plant situated on the Mississippi river between Bordeaux and Lyon streets," including the real estate and the right to the use of the processes, secured to said Sampson by letters patent from the Federal Government, for preserving and treating lumber, etc.

The " Thomas H. Sampson " referred to was the husband of Mrs. Susan A. Sampson, in whom the title to the lots, on which the plant was located, was vested by the sale from Davenport.

It was she who made the sale of the lots to the company, and this act of sale recited that it was made "with all lawful warranties and with full subrogation and substitution to all her rights and actions in warranty."

In the sale of the same property previously by Davenport to Mrs. Sampson express warranty is also stipulated.

When the plaintiff company was organized preceding the purchase from Mrs. Sampson, Thomas H. Sampson became president thereof and L. W. Brown, vice president—the latter accepting the sale from Mrs. Sampson on behalf of the company, while Sampson signed it in authorization of his wife.

Something over two years after the purchase from Mrs. Sampson, the company brought the present action, not against Mrs. Sampson, its immediate vendor, but against *her vendor*, Wilson Davenport, standing on the subrogation and substitution which she had made to it of her rights and actions in warranty against him.

The object of the suit is to recover three thousand dollars from Davenport, on the complaint that in December, 1891, plaintiff company was evicted from a part of the ground which Davenport had sold to Mrs. Sampson and she to them, being a strip about fifty feet

in depth by a width clear across the lots of one hundred and fifty feet.

That which constituted eviction is averred to be this: A considerable tract of alluvion or batture had formed along that portion of the city front. Over this batture parallel with Front street on the north and the river on the south, what is known as Water street was laid out and established in the year 1867 by authority of the then city of Jefferson (now absorbed into the city of New Orleans). This new street crossed the property in question about one hundred and ten feet from Front street.

While laid out on the map and thus designated and established, the street itself was not actually opened and put in use (so far at least as it affected the property we are dealing with) until August 27, 1889, when an ordinance was passed by the council of the city of New Orleans, approved by the Mayor on September 3, 1889, directing the City Surveyor to remove existing obstructions from Water street and to open same, and authorizing a railway track to be laid on the street from Louisiana avenue to General Taylor street.

Prior to this, to-wit: in 1880, and 1881, the council had passed certain ordinances granting rights and privileges in and along the streets on the river front to the Texas & Pacific Railway Company.

Acting under these several ordinances, adopted in 1880, 1881 and 1889, the Texas & Pacific Company laid its tracks in and along Water street, and thus that street became opened for use and traffic as a public street and highway of the city. Louisiana Ice Manufacturing Company vs. City of New Orleans et al., 43 La. An. 217.

This opening of Water street and the laying of the tracks of the railroad company thereon had the effect of dividing the lots which the plaintiff had purchased from Mrs. Sampson, and some evidence was adduced on behalf of plaintiff to show that it impaired the water privileges of the property, which, it was claimed, constituted its chief element of value for the purposes for which the company desired it.

The petition alleges, in substance, that Davenport claimed and had possession of all the property from Front street to the river; that he sold and delivered all of it to Mrs. Sampson; that he warranted title and possession of it all; that there was no indication of any street through it at the time of Mrs. Sampson's purchase;

that neither she nor her vendee (plaintiff company) had any knowledge of the laying off and dedication of a street through it at the time of their respective purchases; and that because of said laying off and dedication Davenport could not sell and convey title and possession to that portion of the lots covered by the street, and having assumed to do so and his vendee having been evicted, he must make restitution.

The demand was met by an exception of no cause of action, which was ordered to stand as part of the answer to the merits. The defence on the merits is that Davenport had no knowledge of the location of a street through the property at the time of his own purchase thereof, nor when he sold it; that if the right to lay out the street existed prior to or at the date of his sale to Mrs. Sampson, she was, in law, charged with knowledge of the same and bought at her peril and risk; that if the cause of eviction arose after her purchase, he is in no sense responsible for the same; and that the opening of Water street, and the authorization to lay railway tracks thereon were public, governmental acts of the city of New Orleans, for which defendant can not be held responsible.

On the issues presented there was judgment below for defendant, and plaintiff appeals.

The affairs of plaintiff company appear not to have gone on well. In the beginning of 1895 it found itself involved in debt, with no funds to meet its obligations. It went into liquidation, with Sampson and Brown as liquidating commissioners. In March, 1895, they applied to the court for an order to sell all the property of the insolvent corporation, movable and immovable, to pay its mortgage and other debts.

This order was granted and the entire property was sold at one offering for two thousand four hundred and ten dollars, John T. Whittaker, agent, becoming the purchaser. Who his principal was is not disclosed.

In the application for the sale of the real estate the commissioners set forth that since the company acquired it the city of New Orleans had laid out Water street through it; that the property had thus become divided into two parts; and that these parts should be sold separately. They annexed a plan and asked that the sale be made in accordance therewith—that is to say, that the part between Front and Water streets be sold as lots six, seven, eight,

nine and ten in square eighty, with a front on the two streets of one hundred and fifty feet, by a depth between the streets of about one hundred and eleven feet; and the part between Water street and the river be sold as a certain portion of ground measuring one hundred and fifty feet on Water street by a depth between parallel lines of about eight hundred and seven feet to the river, together with all rights of batture and future accretions. The *projet* of the sale recited that upon this part of the property, viz.: between Water street and the river, is situated the plant of the Southern Wood Manufacturing and Creosoting Company, Limited.

The order of court directed the property to be sold in the two parts as set forth in the plan of the commissioners, and, accordingly, it was so advertised and sold.

These pleadings and proceedings show that the plant of plaintiff company was located on the *river side* of Water street. This being so, it would appear that the water privileges of the factory were not cut off or seriously impaired by the opening of Water street and the laying of the railway tracks thereon. It also appears that whereas plaintiff company bought the lots as having a depth of about one hundred and fifty to one hundred and sixty feet, more or less, from Front street *to the river*, in point of fact the liquidating commissioners sold the property as having a depth from Front street to Water street of one hundred and eleven feet, and from Water street to the river of eight hundred and seven feet, or a total depth of nine hundred and eighteen feet, *exclusive of the fifty feet* constituting Water street.

With the fifty feet of Water street added, the property has a depth, from Front street to the river, of nine hundred and sixty-eight feet. It thus appears that Water street, in passing through the lots, has occupied only about one nineteenth part of their entire depth, and only to this extent has plaintiff company suffered actual eviction.

Conceding that over the batture formed by the recession of the river and attaching as riparian rights to the original lots fronting on the river, the city authorities could lay off and establish Water street, this could not divest the riparian proprietor of the fee of the land occupied by the street, 11 An. 161; C. C. 658, 665. It can hardly be claimed that the city's action established anything more than a servitude, or easement, for street purposes over that part of

the property occupied by Water street, with the resulting right to the riparian proprietor to retake possession of, and subject the ground to his purposes, should it ever cease to be used as a street.

It follows that plaintiff company has not been evicted from the fee of the ground occupied by the street, but only from its use and possession.

Indeed, the petition itself does not claim more than that the petitioner.has been evicted from *the possession* of a portion of the ground sold by the defendant.

But taking the view most favorable to plaintiff company—that Water street will remain as a street for all time to come—and that plaintiff has been evicted, for all practical purposes, of both the fee and the possession of the ground it occupies, what, if anything, is it entitled *to recover* of this defendant?

That recovery is, under the circumstances of this case, authorized by the law appears clear. C. C. 2475, 2491, 2492, 2500, 2506, 2514.

Though Davenport did not know, when he sold to Mrs. Sampson, that Water street had been laid out across the lots can make no difference. He sold the ground now occupied by the street and delivered possession of it. His vendee has been evicted. By the express terms of C. C. 2514 "the value of the part from which he is evicted is to be reimbursed to the buyer according to its estimation, proportionably to the total price of the sale."

Plaintiff claims that the value of the part evicted from is three thousand dollars, and there is testimony to this effect by the witness Sampson.

But we can not accept this estimation. Sampson bases it upon the idea of the factory's deprivation of water privileges. We have already seen that, by his own pleadings as liquidating commissioner of plaintiff company, he is cut off from this contention. Besides, the petition contains no averment of this character. Nor does it charge that the part evicted from was, *relatively to the whole*, worth three thousand dollars. Nor that the purchase would not have been made but for the inclusion of this part.

From the circumstances and surroundings it is hard to resist the impression that no injury whatever has been suffered by the buyer o this property by reason of the opening of Water street through it. It gives the property two additional fronts, and the laying of the track of the Texas & Pacific Railway on Water street gives it railway privileges, while it still retains its water privileges.

We think substantial justice will be done by awarding plaintiff a judgment for the value of the part evicted from, estimated proportionately to the price paid for the whole.

We have already seen that the part lost is, in area, about one-nineteenth of the whole, and one-nineteenth of the price paid (five thousand dollars) is two hundred and sixty-three dollars and fifteen cents.

It is therefore ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and it is now ordered and decreed that plaintiff do have and recover of the defendant the sum of two hundred and sixty-three dollars and fifteen cents, with legal interest thereon from judicial demand, to-wit: April 3, 1893, until paid, together with costs of both courts.